Argued and submitted September 27, 2016, affirmed on petition and cross-petition March 22, petition for review allowed June 29, 2017 (361 Or 645)

STOP THE DUMP COALITION,
Willamette Valley Wineries Association,
Ramsey McPhillips, and
Friends of Yamhill County,
*Petitioners
Cross-Respondents,*

*v.*

YAMHILL COUNTY
and Riverbend Landfill Co.,
*Respondents
Cross-Petitioners.*

Land Use Board of Appeals
2016026; A162746

391 P3d 932

Jeffrey L. Kleinman argued the cause for petitioners-cross-respondents. With him on the joint briefs was William F. Paulus.

Tommy A. Brooks argued the cause for respondents-cross-petitioners. With him on the joint briefs were James E. Benedict, Cable Huston LLP, and Timothy S. Sadlo.

Before Sercombe, Presiding Judge, and Flynn, Judge, and DeHoog, Judge.

**SERCOMBE, P. J.**

Petitioners Stop the Dump Coalition, Willamette Valley Wineries Association, Ramsey McPhillips, and Friends of Yamhill County seek judicial review and respondents Yamhill County and Riverbend Landfill Co. (Riverbend) cross-petition for review of an order of the Land Use Board of Appeals (LUBA) that remands to the county its site design review and floodplain permit approvals for an expansion of the Riverbend Landfill. That landfill is a solid waste disposal facility that is located on a larger area of land zoned for exclusive farm uses (EFU); petitioners and respondents assign error to LUBA's determinations of the legal and evidentiary sufficiency of the county's application of ORS 215.296, which sets standards for approval of, among other things, solid waste disposal facilities, in an EFU zone.[1] On review, we evaluate whether LUBA's determinations are "unlawful in substance," ORS 197.850(9)(a), and affirm on the petition and the cross-petition.

BACKGROUND

Riverbend, which owns and operates the Riverbend Landfill, applied to the county for permission to expand that operation. LUBA set out the history of the applications in an earlier order in the case:

"Riverbend * * * filed applications for site design review and a floodplain development permit to authorize the proposed expansion. Riverbend proposed to add a new Module 10 north of the existing landfill site, and a new Module 11 southwest of the site. The proposed expansions would occupy land that qualifies as high-value farmland. Riverbend also proposed to increase the height of existing berms and add additional fill to five existing modules. The proposed expansions would add 15 years of capacity to the

---

[1] ORS 215.296(1) provides:

"A use allowed under ORS 215.213(2) or (11) or 215.283(2) or (4) may be approved only where the local governing body or its designee finds that the use will not:

"(a) Force a significant change in accepted farm or forest practices on surrounding lands devoted to farm or forest use; or

"(b) Significantly increase the cost of accepted farm or forest practices on surrounding lands devoted to farm or forest use."

landfill operation, which would otherwise reach full capacity in 2017.

"The surrounding area consists largely of EFU-zoned lands in various agricultural uses * * *."

*Stop the Dump Coalition v. Yamhill County*, 72 Or LUBA 341, 347 (2015) (*SDC-1*). The additional modules or areas of disposal created a new "working face," that is, a new area where waste is removed from containers and placed in an open area prior to being covered. The change of location of the working face, in turn, created additional farm impacts for the landfill operations.

As part of the site design review, Riverbend was obliged to show that the enhanced solid waste disposal facility complied with the standards in ORS 215.296(1) applicable to conditional nonfarm uses.[2] The county approved the site design review and floodplain development permit applications, concluding that the expanded landfill did not force a significant change in accepted farm practices or significantly increase the cost of those practices. *Id.* at 358. Petitioners appealed to LUBA, which remanded the decisions back to the county for additional findings. *Id.* at 377. In the order under review in this case, LUBA described the earlier remand:

"The present decision is on remand from LUBA. *Stop the Dump Coalition v. Yamhill County*, 72 Or LUBA 341 (2015) (*SDC-1*). In that decision, LUBA sustained two assignments of error in part concerning ORS 215.296(1), which requires a finding that the proposed use in an exclusive farm use zone will not force a significant change in accepted farm practices, or significantly increase the cost of such practices, on surrounding lands. The ORS 215.296(1) test is sometimes referred to as the Farm Impacts test or the significant change/cost standard.

"In *SDC-1*, LUBA identified several analytical errors and remanded the county's decision to reevaluate the evidence in the record free of those analytical errors, and to determine whether Riverbend has demonstrated that the

---

[2] Yamhill County Zoning Ordinance 402.02(V) allows "the maintenance, expansion or enhancement of an existing site on the same tract for the disposal of solid waste * * * [if] [t]he use satisf[ies] the standards set forth in ORS 215.296(1)(a) and (b) and the standards set forth in Section 1101, Site Design Review."

cumulative impacts of the proposed use will not force a significant change in, or significantly increase the costs of, accepted farm practices on surrounding lands. In particular, LUBA directed the county to reconsider the evidence with respect to several types of landfill expansion impacts on farm practices, including: (1) impacts of litter on the adjacent McPhillips farm, (2) impacts of nuisance birds on nearby farms, (3) impacts on pheasant-raising operations on the McPhillips farm, and (4) impacts on farm stands and direct farm sales on nearby farms.

"On remand, the county commissioners re-opened the evidentiary record to accept new evidence with respect to some of the remand issues, conducted a public hearing on February 4, 2016, and allowed the parties to file written rebuttal of new evidence until February 11, 2016. On February 18, 2016, the commissioners deliberated and re-approved the proposed use, adopting findings in support on February 25, 2016. This appeal followed."

(Footnote omitted.)

In their second appeal to LUBA, petitioners challenged the county's modified findings on the effects of the expanded landfill on the accepted farm practices of surrounding farmland, specifically the findings on the effects of windblown litter on hay farming; "nuisance birds" on grass-seed farming, fruit, berry and nut cultivation, poultry operations and the raising of livestock; landfill odor on direct farm sales and farm stands; the general operation of the landfill on vineyards and wineries; and the cumulative impacts of the landfill on accepted farm practices. LUBA determined that the county's findings under ORS 215.296(1) were supported by substantial evidence, except for the cumulative impacts findings. Accordingly, LUBA remanded the decision to the county for a determination of "whether multiple insignificant impacts to each particular farm operation, considered together, reach the threshold of significance for that particular farming operation."

On review, petitioners contend that LUBA erred in (1) upholding conditions of approval under ORS 215.296(2) that required Riverbend to pay for some of the increased costs of accepted farm practices caused by the expanded landfill in order to satisfy the significant cost increase standard;

(2) approving conditions that, in petitioners' view, did not satisfy ORS 215.296(2) because the record lacked evidentiary support that the operation of the conditions would satisfy the approval standards and because the conditions were not clear and objective; (3) concluding that a decline in wine grape prices at a nearby vineyard where the grapes were sold was not a significant change to, or an increased cost of, an accepted farm practice; and (4) failing to require the county to analyze the overall cumulative impacts on all of the surrounding farmland, considered as a whole. Respondents, for their part, assert that LUBA erred when it concluded that the county did not adequately address the cumulative impacts to farm practices for individual farms.

## STANDARD OF REVIEW

Our review of the parties' contentions in this case requires an analysis of the meaning of ORS 215.296(1). We also consider LUBA's review of the county's application of that statute under ORS 197.835(9)(a)[3] in light of our own standard of review of LUBA's decision under ORS 197.850(9)(a). We begin with a description of the text and context of ORS 215.296(1), before proceeding to the standards of review that apply to LUBA's determinations about that statute.

ORS 215.203(1) authorizes counties to adopt EFU zones and further provides that, in EFU zones, land is to be used "exclusively for farm use except as otherwise provided in ORS 215.213, 215.283 or 215.284."[4] ORS 215.283(1), in

---

[3] Under ORS 197.835(9)(a), LUBA reviews a local government land use decision for whether the local government

"(A) Exceeded its jurisdiction;

"(B) Failed to follow the procedures applicable to the matter before it in a manner that prejudiced the substantial rights of the petitioner;

"(C) Made a decision not supported by substantial evidence in the whole record;

"(D) Improperly construed the applicable law; or

"(E) Made an unconstitutional decision."

Petitioners claimed that the county decisions warranted reversal under ORS 197.835(9)(a)(C) and (D).

[4] ORS 215.203(2)(a) defines "farm use" to include

"the current employment of land for the primary purpose of obtaining a profit in money by raising, harvesting and selling crops or the feeding, breeding,

turn, lists 24 permitted nonfarm uses that counties must allow on EFU land, subject to state standards adopted by the Land Conservation and Development Commission. ORS 215.283(2) provides for 27 conditional nonfarm uses that are "subject to ORS 215.296," including, under ORS 215.283(2)(k), a "site for the disposal of solid waste *** for which a permit has been granted under ORS 459.245 by the Department of Environmental Quality together with equipment, facilities or buildings necessary for its operation."

As noted, ORS 215.296 regulates the allowance of conditional nonfarm uses:

"(1)  A use allowed under ORS 215.213(2) or (11) or 215.283(2) or (4) may be approved only where the local governing body or its designee finds that the use will not:

"(a)  Force a significant change in accepted farm or forest practices on surrounding lands devoted to farm or forest use; or

"(b)  Significantly increase the cost of accepted farm or forest practices on surrounding lands devoted to farm or forest use.

"(2)  An applicant for a use allowed under ORS 215.213(2) or (11) or 215.283(2) or (4) may demonstrate that the standards for approval set forth in subsection (1) of this section will be satisfied through the imposition of conditions. Any conditions so imposed shall be clear and objective."[5]

Thus, this case concerns whether LUBA properly interpreted and applied ORS 215.296(1) in its review of the county's findings on the impacts on accepted farm practices by an expanded landfill. We review LUBA's order to determine

---

management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. 'Farm use' includes the preparation, storage and disposal by marketing or otherwise of the products or by-products raised on such land for human or animal use."

[5] Under ORS 215.203(2)(c), "accepted farm practices" means "a mode of operation that is common to farms of a similar nature, necessary for the operation of such farms to obtain a profit in money, and customarily utilized in conjunction with farm use."

whether it is "unlawful in substance." ORS 197.850(9)(a). As noted in *Zimmerman v. LCDC*, 274 Or App 512, 519, 361 P3d 619 (2015),

> "[t]he 'unlawful in substance' review standard for LUBA orders under ORS 197.850(9)(a)—and, by analogy, for review of LCDC orders under ORS 197.651(10)—is for 'a mistaken interpretation of the applicable law.' *Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001). In *Dimone v. City of Hillsboro*, 182 Or App 1, 6 n 5, 47 P3d 529 (2002), we explained that the 'unlawful in substance' standard 'is the functional equivalent' of the 'erroneously interpreted a provision of law' standard in ORS 183.482(8)(a) that is applicable to our review of an order in a contested case issued by a state administrative agency."

Furthermore, we review LUBA's substantial evidence review of a local government's findings as follows:

> "LUBA considers all the evidence in the entire record in evaluating whether a factual finding is supported by substantial evidence and determines whether a reasonable person could make that finding. *Younger* [*v. City of Portland*, 305 Or 346, 356, 752 P2d 262 (1988)]. We review LUBA's determination of the substantiality of the evidence for a local government finding on whether the LUBA opinion is 'unlawful in substance' under ORS 197.850(9)(a). Our task is not to assess whether the local government erred in making a finding, but to determine whether LUBA properly exercised its review authority. Thus, we do not substitute our judgment for LUBA's on whether a reasonable person could make a finding of fact based upon the entire local government record. Instead, we evaluate whether LUBA properly stated and applied its own standard of review. If LUBA does not err in the articulation of its substantial evidence standard of review under ORS 197.835(9)(a)(C), we would reverse LUBA's decision only when there is no evidence to support the finding or if the evidence in the case is 'so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review.'"

*Citizens for Responsibility v. Lane County*, 218 Or App 339, 345, 180 P3d 35 (2008) (quoting *Younger*, 305 Or at 359); *see also Von Lubken v. Hood River County*, 118 Or App 246, 250-51, 846 P2d 1178, *rev den*, 316 Or 529 (1993) (characterizing

ORS 215.296(1) findings as factual findings subject to substantial evidence review by LUBA).

## CONDITIONS OF APPROVAL
## UNDER ORS 215.296(2)

In their first assignment of error, petitioners contend that LUBA erred in upholding conditions of approval under ORS 215.296(2) that did not mitigate or remedy the expanded landfill's significant change/cost effects on two farms. The first set of conditions related to the McPhillips farm, which is adjacent to and downwind of the Riverbend Landfill. McPhillips testified that windblown trash from the working face of the landfill forced him to conduct frequent patrols of his farm throughout the year to prevent plastic bags and other litter from the landfill from being buried in the soil and to conduct additional patrols of his hayfield before harvesting the hay to prevent damage to the baling machines and contamination of the hay bales by plastic bags.

The county adopted findings that discounted the frequency and significance of the trash intrusions on the McPhillips farm.[6] The county imposed two conditions of approval "[t]o remove any doubt about the significance of litter impacts from Riverbend Landfill." Condition 24 required Riverbend to "provide additional litter fencing between the working face of the landfill and the McPhillips farm." Condition 25 provided that Riverbend "must ensure that the grass and hay fields located on the McPhillips farm *** are patrolled for litter prior to when those fields are

---

[6] One of the findings pertained to the current efforts by Riverbend to reduce the intrusion of trash on adjacent properties:

"Between the working face and any surrounding properties devoted to farm use are large 'buffer' areas consisting either of property Riverbend owns or of non-farmed lands containing stands of trees or riparian habitat. Further, based on prevailing wind patterns described in the [Farm Impacts Area], potential litter impacts will be limited in geography and escaping litter is likely to move only in a general direction from west to east. However, Riverbend has also installed litter fences on the east side of its property to intercept any such litter. Within this area, Riverbend conducts regular litter patrols that further reduce[] the amount of litter that could go beyond the buffer areas or the existing litter fences. The record reveals that the amount of litter collected as part of the litter patrols is quite small (approximately one to two trash bags collected twice per week ***)."

harvested" by Riverbend, or, alternatively, by either petitioner McPhillips or a third party at Riverbend's expense.[7]

Before LUBA, petitioners argued that Condition 24 was too narrow in addressing only windblown litter to the McPhillips farm (and not other litter emanating from the landfill) and that the Condition 24 failed to show mitigation "because there is neither a minimum requirement for the amount of additional fencing nor any evidence that any such amount would be effective." Petitioners further asserted that Condition 25 was "irrelevant and inadequate" because "patrolling for litter either is or is not a significant change/cost. If it is a significant change/cost, it is irrelevant who pays for it." Petitioners also argued that Condition 25 did not address litter impacts to other farms or the patrolling of the McPhillips farm that is necessary in times other than harvesting time.

LUBA determined that the "county could reasonably rely on Conditions 24 and 25 to demonstrate compliance with ORS 215.296(1)." LUBA concluded that (1) substantial evidence supported the county's findings that the second litter fence would likely reduce the amount of trash reaching the McPhillips farm and that other sources of windblown trash were not significant; (2) the minimum length of the second litter fence was objectively certain, that is, "the length necessary to stand between the working face and the McPhillips farm"; (3) the operation of both conditions would allow "a reasonable decision-maker [to] conclude that the reduced amount of landfill trash that reaches the McPhillips property will not force a significant change in farm practices, or significantly increase McPhillips' costs";

---

[7] Condition 25 provided:

"Until Riverbend Landfill no longer receives waste for landfilling, the Applicant must ensure that the grass and hay fields located on the McPhillips farm (Tax Lots 401 and 700) are patrolled for litter prior to when those fields are harvested through one of the three following methods, the choice of which shall be at the sole discretion of the owner/operator of the McPhillips farm:

"i.    Applicant will provide litter patrolling services[;]

"ii.   The Owner/Operator and Applicant will jointly identify a third party to provide litter patrolling services at the Applicant's sole expense[;]

"iii.  The Owner/Operator will provide litter patrolling services and Applicant will reimburse that actual, reasonable costs for those services."

(4) Condition 25 does not "exceed[] the county's authority under ORS 215.296(2) or otherwise [is not] an impermissible method to prevent or render insignificant costs or changes to accepted farm practices that would otherwise occur"; (5) "the county could reasonably conclude that Condition 25 would reduce the impacts of plastic bags on the baling process and the sale of bales to an insignificant level"; and (6) while there was no direct evidence that the year-round litter patrols after implementation of the conditions would constitute significant changes to accepted farm practices, the county could reasonably conclude that the additional litter fence and harvest patrols would not cause a significant change in accepted farm practices on the McPhillips property.

The second set of conditions of approval pertained to the Frease farm. One of the new landfill modules brought operations one-quarter mile closer to, and within one-half mile of, the Frease farm. That farm maintains a large hazelnut orchard, a five-tree cherry orchard, and a small berry operation. Frease testified that birds attracted to the landfill flew over her farm and defecated on the berries and cherries, rendering the crops unmarketable. As a result of concerns about contamination and disease, Frease ceased sale of that produce. The county found that those concerns were unfounded, and that the landfill did not force any change in marketing. The county additionally determined that the imposed conditions relating to bird management would satisfy ORS 215.296(1) with respect to the Frease farm. In addition, the county imposed Conditions 26 and 27, which require Riverbend to purchase the Frease farm's entire crop of cherries and berries at an annually adjusted market price.[8]

_____

[8] Specifically, those conditions provided:

"26. Upon commencement of waste disposal in the expansion area, and until Riverbend Landfill no longer receives waste for landfilling, the Applicant shall purchase all cherries produced and presented to the Applicant for sale by the Frease farm from the existing cherry trees (Tax Lot 5502-700) at the rate of $4.50 per pound. Each year, Riverbend must provide documentation to the County establishing the average retail rate of cherries in the McMinnville area and adjust the above rate accordingly.

"27. Upon commencement of waste disposal in the expansion area, and until Riverbend Landfill no longer receives waste for landfilling, the Applicant

Before LUBA, Friends of Yamhill County (FOYC) argued that selling to a single buyer rather than multiple buyers was a significant change in accepted farm practices because, when the landfill closed, the Frease farm would have no developed markets and would incur additional costs to develop the lost market. LUBA concluded:

"[W]hile selling to a single buyer rather than multiple buyers may be a change in farm practices, it is not clear why it would be an adverse change. Selling to a single buyer might reduce marketing and other costs and practices necessary to sell to multiple buyers. We do not think that ORS 215.296(1) is concerned with changes that benefit or reduce the costs of farm practices. In any case, the alleged significant change here is the complete cessation of cherry and berry sales, not single versus multiple buyers. Conditions 26 and 27 effectively restore the lost cherry and berry sales, and thus would seem to either eliminate the alleged significant change or reduce it to insignificance. Further, if after the landfill closes the Frease Farm resumes sales to multiple buyers, that would seem to restore the status quo ante. FOYC had not demonstrated that a reasonable decision-maker could not rely in part on Conditions 26 and 27 to ensure compliance with ORS 215.296(1) with respect to impacts on the Frease Farm."

On review, petitioners argue that the accepted farm practice on the McPhillips farm is to "grow, harvest, bale and sell hay" without trash in the fields and that the litter patrols required by Condition 25, regardless of who pays for or conducts them, are "significant changes" to that accepted farm practice under ORS 197.296(1)(a). With respect to the part of Condition 25 that requires Riverbend to pay for the costs of harvest patrols, petitioners assert that the payment of any increase in the costs of an accepted farm practice does not avoid a finding of a significant increase in the cost of the accepted farm practice under ORS 215.296(1)(b).

Petitioners reiterate that argument about purchasing compliance under ORS 215.296(1)(b) with respect to the

shall purchase all berries produced and presented to the Applicant for sale by the Frease farm from the existing berry vines (Tax Lot 5502-700) at the rate of $4.00 per pound. Each year, Riverbend must provide documentation to the County establishing the average retail rate of berries in the McMinnville area and adjust the above rate accordingly."

produce payment conditions for the Frease farm. Petitioners also criticize LUBA's analysis with respect to Conditions 26 and 27 that ORS 215.296(1) is not concerned with "changes that benefit or reduce the costs of farm practices." They argue that the statute is not limited to adverse changes. Finally, petitioners assert that LUBA's assumption about the Frease farm's ability to return to the status quo ante after the closure of the landfill—so that there is no long-term change in the marketing farm practice—is without evidentiary support.

Respondents counter that the litter patrol condition does not change any accepted farm practice (raising, harvesting, and baling hay) and, even if it does, the condition works to make any change less than significant. They further assert that the expanded landfill does not force a change in the accepted farm practice of selling cherries and berries from the Frease farm. Respondents finally argue that, even if the accepted farm practice is selling to numerous customers, the conditions do not significantly change that practice.

Under the plain text of the statute, whether the litter patrols or the change in the marketing of produce inhibit approval of the landfill expansion under ORS 215.296(1)(a) depends upon whether (1) the expanded landfill has necessitated the litter patrols or change in the produce marketing; (2) those conditions are changes to "accepted farm practices"; (3) any such change to an accepted farm practice is "significant"; and (4) the significant change in an accepted farm practice cannot be avoided or mitigated through the imposition of conditions under ORS 215.296(2). Whether those conditions "[s]ignificantly increase the cost of accepted farm practices" under ORS 215.296(1)(b) depends, in turn, upon whether (1) the expanded landfill has increased the costs of litter patrols or produce marketing; (2) litter patrols and produce marketing are "accepted farm practices"; (3) the increased costs are "significant"; and (4) the increased costs cannot be mitigated or avoided through the imposition of conditions under ORS 215.296(2).

We conclude that the required hay harvest litter patrol does not change an accepted farm practice under ORS 215.296(1)(a). As noted, under ORS 215.203(2)(c),

"accepted farm practice" means "a mode of operation that is common to farms of a similar nature, necessary for the operation of such farms to obtain a profit in money, and customarily utilized in conjunction with farm use." Petitioners do not contend that litter patrols are common to hay farms, are necessary to obtain a profit in money from hay farming, or are customarily utilized in conjunction with agricultural operations, so as to qualify litter patrols in general as accepted farm practices. Indeed, they do not dispute LUBA's conclusion that "[i]t is important to recognize that the litter patrols described by McPhillips are not 'accepted farm practices.'" Thus, the litter patrols that are necessitated on the McPhillips farm do not "*change* [an] accepted farm * * * practice[]" under ORS 215.296(1)(a) (emphasis added).

The compelled harvest litter patrol, however, does increase the cost of an accepted farm practice under ORS 215.296(1)(b). The relevant accepted farm practice is the harvesting and baling of hay. We assume that those modes of operation are common to hay farms, are necessary in order to obtain a profit from the sale of hay, and are customarily utilized in conjunction with "farm use" as defined by ORS 215.203(2)(a) ("the current employment of land for the primary purpose of obtaining a profit in money by * * * harvesting and selling crops"). The addition of a litter patrol increases the costs of harvesting and baling hay.

To whatever extent the harvest litter patrol increases the cost of the accepted farm practice of cutting and baling hay, the county found that the increased cost was not "significant." LUBA concluded that the operation of Conditions 24 and 25 would allow "a reasonable decision-maker [to] conclude that the reduced amount of landfill trash that reaches the McPhillips property will not * * * significantly increase McPhillips' costs." We conclude that LUBA correctly understood and applied the substantial evidence test in reaching that conclusion. *See Citizens for Responsibility*, 218 Or App at 345; *Von Lubken*, 118 Or App at 250-51.

However, petitioners contend that, as a matter of law, the increased costs are "significant" because the conditions are ineffective to mitigate the incurring of those costs in the first instance. That contention requires an evaluation

of the meaning of "significant" in ORS 215.296(1). We determine the legislative intent in the use of the terms "significant" and "significantly" in ORS 215.296 by examining the text, context, and legislative history of the provision together with general maxims of statutory construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). In *SDC-1*, LUBA observed that the plain meaning of "significant" is "having or likely to have influence or effect":

> "Because the term 'significant' is undefined, and of common usage, it is permissible to consult dictionary definitions. The most pertinent definition of 'significant' in *Webster's Third New International Dictionary* (2002), 2116, appears to be '**3 a :** having or likely to have influence or effect **:** deserving to be considered[.]' Because ORS 215.296(1) is framed in the negative (the applicant must demonstrate that the proposed use 'will not' force a significant change, etc.), it seems appropriate to consider related antonyms such as the term 'insignificant,' which Webster's defines in relevant part as 'e **:** of little size or importance[.]' *Id.* at 1169."

72 Or LUBA at 359 n 12 (brackets and boldface in original).

We have construed provisions permitting nonfarm uses in EFU zones, to the extent possible, as consistent with the overall statutory policy of preventing agricultural land from being diverted to nonagricultural use. *See McCaw Communications, Inc. v. Marion County*, 96 Or App 552, 555, 773 P2d 779 (1989) ("[S]tate and local provisions [defining nonfarm uses permitted in farm zones] must be construed, to the extent possible, as being consistent with the overriding policy of preventing agricultural land from being diverted to non-agricultural use." (Internal quotation marks omitted.)). Analogously, we have construed ORS 215.283 in light of the "contextual guide" provided by ORS 215.243, which states the agricultural land use policies for the state. *See Warburton v. Harney County*, 174 Or App 322, 329, 25 P3d 938, *rev den,* 332 Or 559 (2001).

Under ORS 215.243(2),

> "[t]he preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources and the preservation of such land in large blocks is necessary in maintaining the

agricultural economy of the state and for the assurance of adequate, healthful and nutritious food for the people of this state and nation."

Whether a change in an accepted farm practice or the cost of that practice is "significant," then, is determined by whether the change affects the preservation of agricultural land for productive use.[9]

That meaning of the term "significant" can also be inferred from the meaning of the terms that it modifies—"change in accepted farm practices" and "increase the cost of accepted farm practices." An "accepted farm practice" that is protected against a "significant change" under ORS 215.296(1)(a) or a significant cost increase under ORS 215.296(1)(b) is a "mode of operation that is * * * *necessary for the operation of such farms to obtain a profit in money*" and that is "utilized in conjunction with farm use." ORS 215.203(2)(c) (emphasis added). And a farm use is "the current employment of land for *the primary purpose of obtaining a profit in money*" by agricultural, horticultural, or animal husbandry use. ORS 215.203(2)(a) (emphasis added). Accordingly, a "significant" change or cost increase of an accepted farm practice is a change or cost increase that will significantly affect the preservation of productive agricultural land for, among other things, the purpose of obtaining a profit in money and providing food.

So understood, the imposition of Condition 25—requiring the payment or avoidance of particular increased costs to the accepted farm practice of harvesting and baling hay in order to preserve productive agricultural land for the purpose of obtaining a profit in money—makes any costs not "significant" under ORS 215.296(1)(b) because those subsidized costs do not affect the profitability of the agricultural enterprise. Similarly, Conditions 26 and 27—requiring the purchase of produce from the Frease farm for its "average

---

[9] Under Statewide Planning Goal 3,

"[a]gricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space and with the state's agricultural land use policy expressed in ORS 215.243 and 215.700."

OAR 660-015-0000(3).

retail rate"—do not force "significant" changes to farm practices because the conditioned practice will not decrease the supply of agricultural land, the profitability of the farm, or the provision of food.

Petitioners' argument that the conditions significantly affect farm practices or the costs of those practices, regardless of whether the conditioned effects are "adverse," misses the point. The issue is whether the effects of those changes are "significant." Accordingly, we reject petitioners' contention that any increase in the costs of farm practices is "significant," even if those costs are avoided or mitigated. Instead, the relevant inquiry is whether the conditioned practice or cost is "significant" because the change will significantly decrease the supply of agricultural land, the profitability of the farm, or the provision of food. Conditions that are imposed to preserve the profitability of a farm make any subsidized cost increase or required marketing insignificant as a matter of law.

## EVIDENTIARY SUPPORT FOR THE CONDITIONS

In their second assignment of error, petitioners assert that certain of the county's conditions of approval are unsupported by substantial evidence of their efficacy and, in certain instances, are not clear and objective. LUBA concluded that the county could reasonably rely on Condition 24 (relating to the provision of litter fencing between the working face of the landfill and the McPhillips farm) and Condition 25 (relating to required litter patrols) to demonstrate compliance with ORS 215.296(1). As to the former condition, LUBA relied on the county's finding that the "working face is the primary source of landfill trash that reaches the McPhillips property," and determined that the "county could reasonably conclude that a second litter fence, located between the working face and the existing fence in the direction of the McPhillips Farm, is likely to further reduce the amount of trash that reaches the McPhillips property." LUBA further determined that the fencing condition

"is sufficiently clear regarding the required minimum length: the length necessary to stand between the working face and the McPhillips Farm. As to effectiveness, petitioners do not dispute that the existing fence is at least

somewhat effective at intercepting landfill trash, and cite no reason to think that the secondary fence will not be at least as effective."

Finally, LUBA determined:

"While the county can reasonably find that the second litter fence will reduce somewhat the amount of landfill trash that reaches the McPhillips property, Condition 24 may not be a sufficient basis in itself to conclude that the need for the litter patrols and other measures McPhillips testified to has been eliminated or reduced below the level of significance. However, as explained below, we believe that with Condition 24 and Condition 25 together a reasonable decision-maker could conclude that the reduced amount of landfill trash that reaches the McPhillips property will not force a significant change in farm practices, or significantly increase McPhillips' costs."

On review, petitioners contend that the imposition of Condition 24 lacks substantial evidence as to its feasibility or efficacy in reducing litter because (1) the condition does not address other sources of litter (litter carried and released by gulls and crows, debris from garbage trucks traveling to the landfill, and trash carried to the property by frequent flood waters) and (2) the county improperly concluded that the working face of the landfill was the primary source of trash to reach the McPhillips property. Petitioners also assert that the county's findings regarding the prevailing wind direction and lack of impacts to farm practices on another farm are not supported by substantial evidence. Additionally, petitioners argue that the feasibility of Condition 25, relating to the provision of litter patrols prior to harvesting hay at the McPhillips farm, is not supported by substantial evidence because McPhillips testified that more frequent litter patrols are necessary and there was no testimony that litter patrols at harvest time alone would be adequate or effective to not force a significant change to, or increase the cost of, accepted farm practices. Petitioners further complain that LUBA's conclusion that there was "no direct evidence from any party" regarding whether the year-round litter patrols are themselves significant changes to accepted farm practices is both unsupported and shifts the burden to objectors to demonstrate the accepted farm practices in the area.

We conclude that LUBA understood and applied the substantial evidence test in its review of the challenged findings and conditions and that, therefore, its order was not "unlawful in substance." *See Citizens for Responsibility*, 218 Or App at 345. As noted, LUBA directly held that "a reasonable decision-maker could conclude that the reduced amount of landfill trash that reaches the McPhillips property will not force a significant change in farm practices, or significantly increase McPhillips' costs." That conclusion states the substantial evidence rule applied by LUBA under ORS 197.835(9)(a)(C) (requiring LUBA to reverse or remand a land use decision if the local government "[m]ade a decision not supported by substantial evidence in the whole record"). We do not substitute our judgment for that of LUBA's in evaluating the substantiality of the evidence, unless "there is no evidence to support the finding or if the evidence in the case is so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review." *Citizens for Responsibility*, 218 Or App at 345 (internal quotation marks omitted). Neither circumstance is present here.[10]

Petitioners argue that the fencing condition is not "clear and objective" under ORS 215.296(2) because it lacks specificity as to the height and location of the fencing, and, accordingly, is insufficient to show that the fencing will inhibit any significant change to accepted farm practices. Various statutes, in addition to ORS 215.296(2), require that standards or conditions of land use approvals be "clear and objective." *See, e.g.*, ORS 197.015(10)(b)(B) (exempting from LUBA review decisions that approve or deny a building permit issued under "clear and objective land use standards"); ORS 197.307(4) (requiring approval standards for certain types of housing within urban growth boundaries to be "clear and objective"); ORS 197.685 (requiring approval standards for farmworker housing to be "clear and objective"); ORS 215.416(8)(b) and ORS 227.173(2) (requiring that standards for approval of a discretionary

---

[10] We reject without further discussion petitioners' contentions that LUBA misstated certain facts or findings in its opinion. Any such misstatements in this case do not undercut the presumed correctness of LUBA's particular substantial evidence review here.

permit application be "clear and objective on the face of the ordinance").

We have interpreted the requirement of clear and objective standards to mean those that do not "introduce subjectivity or discretion into the determination of" whether the standard is met. *Rudell v. City of Bandon*, 249 Or App 309, 320, 275 P3d 1010 (2012); *see also Sisters Forest Planning Committee v. Deschutes Cty.*, 198 Or App 311, 316, 108 P3d 1175 (2005) ("[S]pecificity and clarity are desirable to ensure that the imposed conditions are properly understood not only by the entity responsible for complying with them but also by potential challengers of a permit subject to conditions."); *Tirumali v. City of Portland*, 169 Or App 241, 246, 7 P3d 761 (2000), *rev den*, 331 Or 674 (2001) (if an approval standard is "ambiguous," it is not "clear and objective").

In light of that standard, we agree with LUBA that the condition to install fencing is sufficiently "clear and objective" under ORS 215.296(2) to provide adequate guidance as to its performance and nondiscretionary enforcement. The condition expressly requires the fence to be located "between the working face of the landfill and the McPhillips farm," thus implicitly requiring that it be sufficiently long to protect the bordering area of the farm and that it be "litter fencing," that is, fencing that is comparable to the existing "litter fences" that Riverbend has installed on the east side of its property to intercept litter. Those requirements are sufficiently clear and certain for compliance purposes and allow nondiscretionary enforcement of the condition.

Petitioners' remaining contentions in their second assignment of error concern LUBA's determinations about whether the imposed conditions mitigate any significant change to accepted farm practices caused by large numbers of "nuisance birds," primarily seagulls and crows, that are attracted to the landfill. The county imposed two such conditions:

"22.   Until Riverbend Landfill no longer receives waste for landfilling, the Applicant shall continue its falconry program at an increased level. Specifically, the Applicant must increase falconry activities to no fewer than six days per

week during the time period beginning October 15th and concluding March 15th each year.

"23.    Until Riverbend Landfill no longer receives waste for landfilling, the Applicant must contract with the United States Department of Agriculture Animal and Plant Health Inspection Service for that agency to provide adaptive management bird control measures."

In the proceedings before the county on remand, the parties disputed how many of the birds were present because of the expanded landfill (as opposed to the number of birds present without the landfill), and whether that increase in birds forced a significant change in farm practices or costs related to bird management. Riverbend's falconer testified that the existing falconry program "has proven highly effective at deterring unwanted birds and reducing their overall numbers both at the landfill and on neighboring properties," and that, with an increase in that program from two to four days per week to six days per week, "the flocks [will] quickly become less concentrated and disperse more widely * * * [to] discover new natural sources of food * * * [and] would have no incentive to remain nearby and would abandon neighboring fields much more quickly."

On review, LUBA found that there was no dispute that "nuisance birds as a whole presently cause significant changes in farm practices and significantly increase costs on nearby grass-seed farms." However, LUBA concluded that more was required to show a violation of ORS 215.296. Instead, LUBA explained, the probative issue under ORS 215.296(2) is whether the landfill as conditioned by the decision would cause a significant change or cost increase to accepted farm practices. To that end, LUBA concluded that the falconer's testimony demonstrated the viability of Condition 22 to mitigate an ORS 215.296(1) violation:

"As is frequently the case with land use approvals, conditions are imposed based on predictions about future effectiveness, and such predictions are sometimes little more than educated guesses. Generally, a decision-maker can have more confidence in the informed predictions of a subject-matter expert, compared to similar predictions by non-experts. And, a decision-maker can have more confidence in expert predictions where there is no conflicting

evidence about the effectiveness of the condition. In the present case, the falconer is a wildlife biologist and expert in nuisance bird control. While there is plenty of conflicting evidence regarding the efficacy of the *existing* intermittent falconry program, we are cited to no conflicting testimony regarding the effectiveness of the more intensive falconry program required by Condition 22. While petitioners argue that Condition 22 is simply doubling down on what they argue is an ineffective or actually harmful program, as we understand it[,] Condition 22 is intended to fix a perceived shortcoming in the existing intermittent falconry program. If Condition 22 in fact can fix that shortcoming, then the falconry program may be able to reduce nuisance bird populations attributable to the landfill to a level not significantly greater than would be present in the absence of the landfill, in the manner that the falconer predicted."

(Emphasis in original.)

Regarding Condition 23, LUBA noted:

"The USDA biologist stated that '[t]here is no single new or old bird control method that eliminates birds from frequenting and damaging agricultural or landfill operations,' and recommended an integrated approach that employs a wide of range of techniques, including (1) managing the working face of the landfill to minimize the availability of food items, (2) install parallel monofilament or wire lines to exclude birds, (3) eliminate bare ground/short grass areas by planting taller grasses or vegetation, (4) eliminate water sources, (5) use visual & audio repellents, and (6) implement lethal control of non-protected species and limited lethal control of protected species under a U.S. Fish and Wildlife permit to increase the effectiveness of non-lethal deterrents."

LUBA determined that there is no evidence that obtaining a contract with the USDA to provide adaptive management bird control measures was not feasible. It further determined that petitioners did not dispute that some of the recommended measures will apply and will "contribute to the effectiveness of the effort to control nuisance bird populations attracted to the landfill[.]" For those reasons, LUBA concluded that "a reasonable decision-maker, considering the evidence in the whole record, could conclude that Riverbend has demonstrated that, with the conditions imposed, the

nuisance bird populations attracted to the landfill will not significantly change farm practices, or significantly increase the cost of farm practices, on nearby farms."

Petitioners claim that the record does not support LUBA's determinations of the efficacy of those mitigation measures. According to petitioners, the evidence shows that the adequacy of mitigation measures depends upon the composition of the bird population and the results of testing those measures, and evidence relating to those issues was not presented in the proceedings. Regarding Condition 22, petitioners complain that the evidence is that, at best, the increased falconry will over time drop the seagull bird population to a pre-landfill level, and that is insufficient to show that a more immediate significant change in farm practices will not occur as a result of seagulls. Moreover, petitioners assert that evidence was lacking on the effects of the falconry program on crows and other similar birds. With respect to Condition 23, petitioners argue that evidence is lacking on the nature and feasibility of the adoptive management bird control measures and that the requirement of those measures is not "clear and objective."[11]

We reject petitioners' contentions that LUBA erred in concluding that substantial evidence in the record supported the county's determinations that the conditions were feasible and remedied any significant change in accepted farm practices caused by nuisance birds. LUBA correctly articulated the substantial evidence test in concluding that "a reasonable decision-maker, considering the evidence in the whole record, could conclude that Riverbend has demonstrated that, with the conditions imposed, the nuisance bird populations attracted to the landfill will not significantly change farm practices, or significantly increase the cost of farm practices, on nearby farms." Again, "we do not substitute our judgment for LUBA's on whether a reasonable person could make a finding of fact based upon the entire local government record." *Citizens for Responsibility*, 218 Or App at 345.

---

[11] We reject without further discussion petitioners' claims about the sufficiency of the evidence to support the county's findings on the impacts of crow predation on the lamb- and sheep-raising operation at the Redmond Noble Farm.

As we have explained, a "significant" change in farm practice or increase in the cost of an accepted farm practice is one that will "significantly affect the preservation of productive agricultural land for, among other things, the purpose of obtaining a profit in money and providing food." 284 Or App at 485. It was reasonable for the county to conclude that the temporary effects of nuisance birds on farm practices prior to the full implementation of Conditions 22 and 23 are not "significant," because any temporary effect of nuisance birds on farm practices has no long-term effect of inhibiting the use of agricultural land for profit. The issue is not whether the effects of nuisance birds are significant, but rather whether those effects will force a change in farm practices that significantly inhibits the use of agricultural land for profit.

Finally, petitioners' arguments that the conditions are not "clear and objective" are unpersuasive. The conditions are clear: Riverbend must extend its falconry program in specific ways and contract with the USDA to provide bird management services. Compliance with those conditions can be objectively determined.

## EFFECT OF A CHANGE IN THE PRICE OF FARM PRODUCTS

Before the county, petitioners claimed that a significant change in accepted farm practices or the cost of those practices occurred because the landfill put "downward pressure" on the price of wine grapes sold at a vineyard near the landfill. In their third assignment of error, petitioners claim that LUBA erred in concluding that grape buyers' perceptions about the value of the grapes was not a change in accepted farm practices or an increase in the costs of those practices. LUBA concluded that,

> "while the perceptions of farm stand or direct sales customers might lead a farmer to change farm practices or incur costs, in themselves the possibility of lost sales or reduced prices due to the customer perceptions do not constitute changed farm practices or the increased costs of farm practices."

Petitioners assert that LUBA's statement is misleading, and that there was evidence that the winery had suffered a

cash loss in the sale of wine grapes. They reason that, if the direct sales of farm crops is an accepted farm practice, the olfactory and visual impacts of the expanded landfill upon customer perceptions effects a significant increase in the costs of that accepted farm practice. We disagree and conclude that a decrease in the price of farm products is not a change in the accepted farm practice of marketing the crops to others or an increase in the costs of that practice.

Again, under ORS 215.203(2)(c), "accepted farm practices" means "a mode of operation that is common to farms of a similar nature, necessary for the operation of such farms to obtain a profit in money, and customarily utilized in conjunction with farm use." Here, the relevant practice is the selling of grapes at the vineyard. We assume that that mode of operation is common to vineyards and necessary to obtain a profit in money from growing grapes. That said, there was no evidence that the operation of the landfill would force a change to the practice of selling grapes at the vineyard by, for example, moving that sales activity elsewhere, or otherwise increase the marketing costs of that sales activity. ORS 215.296(1) does not protect against loss in value of farm crops unless that loss in value forces a significant change in accepted farm practices or the costs of those practices. Neither circumstance is present here.

## CUMULATIVE IMPACTS

Petitioners' final assignment of error and respondents' cross-petition concern LUBA's determinations about the county's evaluation of the "cumulative impacts" of the landfill on surrounding farmland under ORS 215.296(1). In *Von Lubken*, we construed ORS 215.296(1) to require the county to consider the "cumulative effects" of the "six impacts" of a golf course conditional farm use on the petitioners' orchard. 118 Or App at 251. Here, LUBA noted that, in that case, we did not "specify a methodology for evaluating cumulative impacts," but that, in a subsequent case, LUBA had "rejected an argument that impacts are always 'additive' in the sense that an individual impact that is almost significant, when considered cumulatively with other insignificant impacts, is necessarily significant." LUBA further noted:

"It is less clear whether a cumulative impacts analysis must also evaluate the cumulative impact of the same type of individual impact (e.g. nuisance birds) spread across multiple farms (e.g. McPhillips, Frease and others). Because no party addresses this point, we assume for purposes of this opinion that the cumulative impacts analysis is limited to the cumulative effect of different kinds of individual impacts on each separate farm, not the cumulative effect of the same kind of impacts on multiple farms considered together."

In its decision on remand, the county found that multiple-impact farms represent only 10 percent of the acreage in the farm study area and cumulatively represent only a "relatively small portion of the landscape." LUBA concluded that that finding was a "misconstruction of the cumulative impacts test. The question * * * is not whether the multiple-impact farms are cumulatively a small proportion of the surrounding farms[.]" Instead, "[t]he question is whether multiple insignificant impacts to each particular farm operation, considered together, reach the threshold of significance for that particular farming operation." LUBA determined that the county findings on multiple impacts were deficient because they did not discuss all of the multiple-impact farms and because the findings improperly fault the farmers involved for failing to explain how multiple impacts are cumulatively significant. It remanded the cumulative impacts analysis back to the county "to correctly apply the cumulative impacts test" and, in so doing, "not take as a given that all individual impacts are insignificant without conditions."

On review, petitioners argue LUBA erred in not requiring the county to consider "the significance of the impacts occurring on multiple farms, viewed cumulatively." We observe that that requirement is not imposed by *Von Lubken*, which required only an analysis of the cumulative impacts on an individual farm. 118 Or App at 251. Nonetheless, petitioners argue, the text of ORS 215.296(1) does not preclude that test of cumulative impacts, and, furthermore, they assert that the more rigorous examination would be consistent with the intent of the statute to "maximize agricultural uses and minimize non-agricultural uses." We disagree.

Contrary to petitioners' contentions, the text of the statute requires an evaluation of "accepted farm or forest practices on surrounding lands devoted to farm or forest use." ORS 215.296(1)(a) and (b). As we stated in *Von Lubken,* the purpose of ORS 215.296(1) is to address the concern that "agricultural uses not be displaced by or subjected to interference from non-farm uses." 118 Or App at 250. A nonfarm use that does not significantly displace or interfere with accepted farm practices at a particular farm in the surrounding lands does not displace or interfere with accepted farm practices in the surrounding lands at all. The whole is equal to the sum of its parts.

In their cross-petition, respondents contend that LUBA erred in concluding that the county's cumulative impacts findings were deficient. They assert that the county's conclusory finding that "the cumulative effect of impacts from the proposed use will not force a significant change in, or significantly increase the cost of, accepted farm practices on surrounding lands" is supported by substantial evidence. In respondents' view, the county did consider multiple-impact farms as part of the cumulative impacts analysis because, in part, its findings discuss the effects on multiple-impact farms in categorical ways (*e.g.,* "the Board has determined that some of those impacts are non-existent, or that they do not rise to a level of significance" and the farmers "do not explain how multiple insignificant impacts become significant when viewed cumulatively"). We agree with LUBA that, notwithstanding any evidentiary support, those categorical findings do not show how the sum of the effects of the landfill on each multiple-impact farm's accepted practices is not significant. The findings fail to set out the facts about each farm that led to the decision about compliance with ORS 215.296(1).

In sum, we conclude that LUBA properly applied the substantial evidence test to the county's findings and correctly construed the meaning and application of ORS 215.296(1) and, accordingly, LUBA's opinion was not unlawful in substance.

Affirmed on petition and cross-petition.