NAKAMOTO, J.
*700 **434 Intervenor-respondent Riverbend Landfill Co. seeks to expand its solid waste landfill in Yamhill County on land zoned for exclusive farm use (EFU). To obtain site design review and a floodplain development permit for the expansion, Riverbend had to meet what is sometimes known as the farm impacts test, set out in ORS 215.296. Subsection (1) of that statute precludes approval of a proposed nonfarm use when the use would "[f]orce a significant change" in accepted farm practices or "[s]ignificantly increase the cost" of those practices on surrounding agricultural lands. Subsection (2) provides that a permit applicant may meet the farm impacts test through the local government's imposition of conditions of approval.
Respondent Yamhill County has determined for a second time that, with conditions of approval, the landfill expansion will not create a significant change in accepted farm practices or significantly increase the cost of those practices on surrounding agricultural lands, thereby meeting the farm impacts test. But petitioners Stop the Dump Coalition, Willamette Valley Wineries Association, and Ramsey McPhillips and petitioner-intervenor Friends of Yamhill County (collectively, petitioners) contend that Riverbend's applications fail the farm impacts test, as it is correctly understood. In broad terms, the parties dispute what the farm impacts test measures and whether some of the conditions that the county imposed for approval are proper under ORS 215.296(2).
On review, petitioners take issue with both the latest order of the Land Use Board of Appeals (LUBA) in Stop the Dump Coalition v. Yamhill County , 74 Or. LUBA 1 (2016) (SDC II ), and the decision of the Court of Appeals upholding that order in Stop the Dump Coalition v. Yamhill County , 284 Or. App. 470, 485, 391 P.3d 932 (2017) ( SDC III ). Petitioners challenge some of the county's conditions of approval, which LUBA and the Court of Appeals approved, and the Court of Appeals' articulation of how the county must evaluate impacts of the landfill expansion on farm practices and their costs.
**435 This case requires us, for the first time, to interpret and apply the farm impacts test in ORS 215.296. Ultimately, we affirm in part and reverse in part the decision of the Court of Appeals and affirm in part, reverse in part, and remand the final opinion and order of the Land Use Board of Appeals.
I. FACTS AND PROCEDURAL HISTORY
A. The County's Reapproval of the Landfill Expansion
Riverbend owns and operates the Riverbend landfill sited on EFU-zoned land in Yamhill County. Stop the Dump Coalition v. Yamhill County , 72 Or. LUBA 341, 346 (2015) (SDC I ). The surrounding area contains EFU-zoned lands in various agricultural uses. Id . at 347. Because parts of its existing site are filling up, Riverbend sought to expand the landfill, including onto adjacent EFU-zoned land that it owns. Id . The expansion "would occupy land that qualifies as high-value farmland" and would "add 15 years of capacity to the landfill operation, which would otherwise reach full capacity in 2017." Id.
A solid waste disposal facility is allowed as one of the 27 nonfarm uses that may be permitted on any EFU-zoned land, if approved by the local governing authority. See ORS 215.283(2)(k). Accordingly, Riverbend submitted applications to the county for a site design review under Yamhill County Zoning Ordinance 1101 and a floodplain development permit under Zoning Ordinance 901. In approving Riverbend's permit applications in 2015, the county imposed numerous conditions of approval on Riverbend and determined that, with Riverbend's adherence to those conditions, the farm impacts test was satisfied.
The county's 2015 approval led participants in the proceedings to file an appeal to LUBA. In that first appeal, LUBA agreed with the challengers that the county had incorrectly determined that the landfill expansion complied with the farm impacts test in *701 ORS 215.296(1). LUBA concluded that the county's approach to determining compliance was flawed, both as to some individual impacts on surrounding farms and as to whether the cumulative effect of individual impacts met the farm impacts test. LUBA noted **436 that the county had not articulated its understanding of "significant," and LUBA suggested that, based on the word's ordinary meaning, "significant" should be understood as a sizeable or important influence or effect. See SDC I , 72 Or. LUBA at 359 n. 12 (identifying a dictionary definition for the word "significant" as "having or likely to have influence or effect" and one for the antonym "insignificant" as "of little size or importance").
LUBA directed the county, on remand, to reconsider evidence with respect to a variety of specific impacts, including (1) impacts of litter on the McPhillips farm, (2) impacts of nuisance birds on nearby farms, (3) impacts on pheasant-raising operations on the McPhillips farm, and (4) odor and visual impacts of the landfill expansion, including on farm stands and direct farm sales on nearby farms. Id. at 361-62, 367-76. In addition, LUBA directed the county to determine "whether Riverbend has demonstrated that the cumulative impacts of the proposed use will not force a significant change in, or significantly increase the cost of, accepted farm practices on surrounding lands." Id. at 377.
On remand, the county reopened the record and accepted additional evidence and arguments. SDC II , 74 Or. LUBA at 6. Petitioners and their members have interests in nearby agricultural land and opposed the county's reapproval of Riverbend's applications. Ramsey McPhillips, the individual petitioner, has a farm adjacent to and downwind of the landfill. Id. McPhillips has a hay operation and raises pheasants and other poultry on his farm. Id. at 6-7, 28.
In 2016, the county commissioners again approved Riverbend's applications for site design review and a floodplain development permit. Id. at 6. In support, the county issued new findings (including Findings 26-34, regarding litter on the McPhillips farm; 51-78, regarding nuisance birds; and 94-96 and 99-110, regarding landfill noise, odor, and visual impact) and modified findings in its 2015 order (including Findings 136-41 pertaining to cumulative impacts).
As before, the county's reapproval depended in part on imposing conditions of approval on Riverbend under ORS 215.296(2). Two of those conditions related to the impact **437 of litter on the McPhillips farm, requiring Riverbend to install an additional litter fence and to provide or pay for litter patrols, consisting of Riverbend employees, McPhillips employees, or third parties (at McPhillips's election) walking the farm and picking up plastic bags and other trash during periods immediately before harvesting the hay field. SDC II , 74 Or. LUBA at 9, 11-15. In addition, two conditions related to nuisance birds generally: Riverbend would have to increase falconry activities during winter months and to contract with the United States Department of Agriculture "to provide adaptive management bird control measures applicable to landfills." Id. at 20. The county imposed two additional conditions to address the impact of nuisance birds on the Frease farm (which has a large hazelnut orchard, a small cherry orchard, and a small berry operation), requiring "Riverbend [to] purchase the entire crop of cherries and berries" from the farm, "at a market price that is adjusted each year." Id. at 23. Riverbend was also required to address the effects of the falconry program on the pheasant and poultry operation on the McPhillips farm by paying for the cost of netting to protect those birds from falcons. Id. at 28-29. The county determined that the conditions of approval would ameliorate significant individual impacts of the expansion of the landfill.
The county also determined that the cumulative impacts of the expansion were not significant, because the farms that would experience multiple impacts represented "only 10 percent of the acreage in the [farm] study area" and "only a 'relatively small portion of the landscape.' " 74 Or. LUBA at 36 (quotation omitted). Relying on that broad-gauge view of cumulative impacts and without evaluating multiple impacts farm by farm, the county found that the proposed expansion will not force a significant change in accepted farm practices or significantly increase the *702 cost of those practices on surrounding farm lands, after Riverbend satisfies conditions of approval. Id. at 36-37.
B. Petitioners' Appeal of the County's Reapproval to LUBA
In their appeal to LUBA of the county's reapproval of the expansion, all petitioners except Friends of Yamhill County (FYC) assigned error to the county's findings **438 concerning the effects of litter on haying and of nuisance birds on grass seed farming, two individual impacts on farm practices. Id. at 6. FYC argued that the county had incorrectly determined the facts concerning other individual impacts on surrounding lands. Focusing on fruit and nut farms, pheasant and poultry operations, and livestock, FYC also raised the impacts of nuisance birds. Additionally, FYC argued that the sight of the landfill expansion would depress prices at vineyards and wineries and that the odor from the expansion would adversely affect direct farm sales and farm stands. FYC also challenged some of the conditions that the county had imposed on Riverbend.
LUBA rejected petitioners' challenge, determining that the county reasonably had concluded that, with the conditions imposed on Riverbend, litter and nuisance birds due to the landfill expansion would not cause significant changes in accepted farm practices for haying and grass seed farming and in the costs of those practices. Id . at 15, 23, 25. LUBA also rejected FYC's arguments concerning individual impacts on various grounds. Id . at 25-35. Ultimately, applying its understanding of "significant" as articulated in SDC I , LUBA affirmed the county's conclusion that, after Riverbend implemented the required conditions imposed by the county, each individual impact of the landfill expansion on surrounding properties-that is, each individual impact to an accepted farm practice or its cost at each farm or agricultural operation-would not be significant.
But LUBA agreed with FYC that the county had employed an improper legal test to analyze the cumulative impacts of the landfill's expansion on the farms that experienced multiple, but less than significant, individual impacts. Id. at 35-37. LUBA observed that the county's approach to finding that those multiple impacts would not be cumulatively significant was to consider whether the farms that would experience multiple impacts were a small proportion of the surrounding lands. Id. at 36. Based on the ordinary meaning of the statutory terms "significant" and "insignificant" in ORS 215.296(1) and on Von Lubken v. Hood River County , 118 Or. App. 246, 846 P.2d 1178, rev. den. , 316 Or. 529, 854 P.2d 940 (1993), LUBA explained that the question is not whether "the multiple-impact farms are cumulatively a small proportion **439 of the surrounding farms, measured by acreage or any other measure." SDC II , 74 Or. LUBA at 5 n. 3, 35-36. Rather, LUBA concluded, the county should have evaluated a different question: "whether multiple insignificant impacts to each particular farm operation, considered together, reach the threshold of significance for that particular farm[ ] operation." Id. at 36.
Thus, LUBA understood the farm impacts test to require a farm-by-farm analysis. Specifically, LUBA concluded that, to determine the significance of changes in or costs of farm practices, the county must consider both the significance of an individual impact and the significance of cumulative impacts of the landfill expansion, as conditioned by the county, on a farm-by-farm basis. Id.
LUBA also concluded that the county's factual findings regarding its cumulative impacts analysis were "inadequate and not supported by substantial evidence." Id. at 35. Because the county had failed to consider whether, cumulatively, individual impacts of the landfill expansion on each farm would amount to a significant change in, or increased cost of, farm practices for that farm, LUBA remanded the matter to the county. LUBA instructed the county to determine whether "individual insignificant impacts, some of which may be additive and some which may not be, are cumulatively significant with respect to each farm that alleged multiple impacts to their farm practices." Id. at 37.
C. The Court of Appeals Decision
Both petitioners and respondents sought judicial review of LUBA's order. The Court *703 of Appeals construed both subsections of ORS 215.296 and affirmed LUBA's order. However, in construing ORS 215.296(1), the court formulated the farm impacts test differently than LUBA had, both as to individual impacts of the proposed landfill expansion and as to cumulative impacts of the expansion.
For a significant change or cost increase, the Court of Appeals focused on whether the impact of the landfill expansion "affects the preservation of agricultural land for productive use." SDC III , 284 Or. App. at 485, 391 P.3d 932 (footnote omitted). The court inferred from the legislative policy declared **440 in ORS 215.243(2) and the text of ORS 215.296(1) that a "significant change" in or a "significantly increased" cost of an accepted farm practice means "a change or cost increase that will significantly affect the preservation of productive agricultural land for, among other things, the purpose of obtaining a profit in money and providing food." Id. Thus, the court explained, a "significant" change "will significantly decrease the supply of agricultural land, the profitability of the farm, or the provision of food." Id. at 486, 391 P.3d 932. Ultimately, the court concluded that the changes to farm practices and costs in this case were not significant. Id.
As for conditions of approval that the county had imposed, petitioners had two basic objections. First, they contended that, in some instances, the county's conditions were not "clear and objective[,]" as required by ORS 215.296(2). Second, petitioners contended that some conditions were improper as significant changes to accepted farm practices in their own right, particularly the condition for litter patrols on the McPhillips farm, at Riverbend's expense, and the condition requiring Riverbend to pay for the entire crop of berries and cherries on the Frease farm, which would be rendered unmarketable by nuisance birds.
As to petitioners' first contention, the Court of Appeals concluded that a clear and objective condition will "provide adequate guidance as to its performance and non-discretionary enforcement." Id. at 489, 391 P.3d 932. Applying that standard, the court concluded that the county's conditions of approval relating to fencing to reduce windblown litter and management of nuisance birds were clear and objective. Id. at 489-90, 391 P.3d 932. As to petitioners' second concern, the Court of Appeals agreed that conditions of approval theoretically could constitute significant changes to accepted farm practices, but it concluded that a litter patrol is not an accepted farm practice at all and, therefore, its imposition is not a change in an accepted farm practice. Id. at 482-83, 391 P.3d 932. The court also rejected petitioners' argument concerning the conditions related to the Frease farm, because the key issue is "whether the effects of those changes are 'significant.' " Id. at 486, 391 P.3d 932. Because paying the farmer for unmarketable produce at the average retail rate preserved the profitability of **441 the Frease farm, the court reasoned, the conditions were not significant changes to accepted farm practices. Id.
II. ANALYSIS
A. Farmland Protection in Oregon's Land Use System
We allowed petitioners' petition for review to address the requirements of the farm impacts test and whether the conditions that the county imposed in this case were statutorily permitted. In addition to briefing from the parties, the court has received briefs on what the farm impacts test requires from amicus curiae State of Oregon, through its Department of Agriculture and Department of Land Conservation and Development (DLCD); amicus curiae 1000 Friends of Oregon; and amicus curiae Oregon Farm Bureau Federation.
All amici emphasize that this case raises questions that must be considered in light of the importance of farmland protection in Oregon. In its brief, the state notes that, as of the beginning of 2017, Oregon had over 35,000 farms and ranches-96 percent family-owned-and that those farms and ranches accounted for $5 billion in sales and 10.9 percent of the state's total exports. And 1000 Friends of Oregon explains in its brief that its own 2013 report on agriculture in Oregon concludes that both urban and rural jobs *704 depend on agriculture. It also states that changes for individual farms can have ripple effects: "[L]oss of productive capacity from individual farms and associated land converted to other uses translates into loss of demand for inputs, services, equipment, processing, and related activities."
Agricultural lands are an important part of Oregon's statewide land use system. See generally Edward Sullivan & Ronald Eber, The Long and Winding Road: Farmland Protection in Oregon 1961-2009 , 18 San Joaquin Agric. L. Rev. 1 (2009) (describing the history of Oregon's tax and land use policies to protect agricultural land and farming). Before turning to the analysis of ORS 215.296, we provide a brief overview of farmland protection's place in the state's land use system.
The legislature's primary statement of agricultural land use policy is contained in ORS 215.243, which has **442 remained unchanged since its enactment as part of Oregon's statewide land use planning system in 1973:
"The Legislative Assembly finds and declares that:
"(1) Open land used for agricultural use is an efficient means of conserving natural resources that constitute an important physical, social, aesthetic and economic asset to all of the people of this state, whether living in rural, urban or metropolitan areas of the state.
"(2) The preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources and the preservation of such land in large blocks is necessary in maintaining the agricultural economy of the state and for the assurance of adequate, healthful and nutritious food for the people of this state and nation.
"(3) Expansion of urban development into rural areas is a matter of public concern because of the unnecessary increases in costs of community services, conflicts between farm and urban activities and the loss of open space and natural beauty around urban centers occurring as the result of such expansion.
"(4) Exclusive farm use zoning as provided by law, substantially limits alternatives to the use of rural land and, with the importance of rural lands to the public, justifies incentives and privileges offered to encourage owners of rural lands to hold such lands in exclusive farm use zones."
Thus, the legislature has declared that preservation of agricultural land, particularly in large blocks, is an important statewide policy and that limitations on urban expansion into, and alternative uses of, agricultural and forest lands are necessary and a matter of statewide concern. The legislature's policy for dwellings on farm and forest lands, set out in another statute, similarly seeks to "[l]imit the future division of and the siting of dwellings upon the state's more productive resource land." ORS 215.700.
Those policy statements are part of a detailed set of statutes concerning agricultural land use generally, including such matters as EFU zoning, soils assessments, rural land maps, dwellings on agricultural land, land divisions, and other uses permitted on agricultural land. See **443 ORS 215.203 - 215.337 ; ORS 215.700 - 215.799. The farm impacts statute at issue is located within the agricultural lands statutes.
The legislature directed the state's Land Conservation and Development Commission "to implement Oregon statutes by adopting land use planning goals that set out broad objectives for land use planning in Oregon." Wetherell v. Douglas County , 342 Or. 666, 676, 160 P.3d 614 (2007) (quotation omitted); see also ORS 197.225 ("The Department of Land Conservation and Development shall prepare and the Land Conservation and Development Commission shall adopt goals and guidelines for use by state agencies, local governments and special districts in preparing, adopting, amending and implementing existing and future comprehensive plans."). Goal 3 is devoted to agricultural lands in Oregon.
Goal 3 first became effective on January 25, 1975. There have been several amended versions since, taking effect in 1983, 1988, 1993, and 1994. As amended, Goal 3 provides in part:
"To preserve and maintain agricultural lands.
*705 "Agricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space and with the state's agricultural land use policy expressed in ORS 215.243 and 215.700.
"USES
"Counties may authorize farm uses and those nonfarm uses defined by commission rule that will not have significant adverse effects on accepted farm or forest practices.
"IMPLEMENTATION
"Zoning applied to agricultural land shall limit uses which can have significant adverse effects on agricultural and forest land, farm and forest uses or accepted farming or forest practices. Counties shall establish minimum sizes for new lots or parcels in each agricultural land designation. The minimum parcel size established for farm uses in farmland zones shall be consistent with applicable statutes. ***
**444 "* * * * *
"GUIDELINES
"* * * * *
"B. IMPLEMENTATION
"1. Non-farm uses permitted within farm use zones under ORS 215.213(2) and (3) and 215.283(2) and (3) should be minimized to allow for maximum agricultural productivity."
Goal 3: Agricultural Lands , Oregon Department of Land Conservation and Development, https://www.oregon.gov/lcd/OP/Pages/Goal-3.aspx (last visited Feb. 21, 2019). Thus, by its terms, Goal 3 both (1) promotes preservation of agricultural land for "farm use" and "maximum agricultural productivity" and (2) limits nonfarm uses of agricultural lands to those "that will not have significant adverse effects" on accepted farming or forest practices.[1]
B. The Farm Impacts Test: ORS 215.296(1)
In broad terms, the parties have two disparate views of how the farm impacts test works. Riverbend and the county defend the Court of Appeals decision. In their view, to determine the significance of changes or cost increases on a single farm or multiple farms caused by a proposed nonfarm use, the local government must take a global view and consider whether the changes rise to the level of causing certain large-scale effects in the surrounding lands, especially a decrease in the supply of agricultural land. Petitioners, on the other hand, see the test operating in granular terms, farm by farm and farm practice by farm practice. They contend that the text of ORS 215.296 indicates that the farm impacts test requires (1) the applicant to properly identify the surrounding lands, the farms on those lands, the accepted farm practices on each farm, and the impacts of the proposed nonfarm use on each farm practice; (2) the local government to determine whether the proposed **445 nonfarm use will force a "significant" change to, or cost increase in, an accepted farm practice, as that term is ordinarily used; and (3) if there is a significant change, the local government to determine whether the applicant has demonstrated that, with conditions of approval imposed pursuant to subsection (2) of the statute, the nonfarm use meets the test. As we will explain, we agree with petitioners that the legislature intended the farm impacts test to apply on a farm-by-farm and farm practice-by-farm practice basis and intended to use the ordinary meaning of "significant" and "significantly" in ORS 215.296(1), not a specialized meaning tied to the supply of agricultural land, supply of food, or farm profitability.
1. Significance of an individual impact
We begin with how a local government must determine whether an individual impact on an accepted farm practice or its cost is significant under ORS 215.296(1). On review, petitioners contend that the Court of Appeals drew an erroneous conclusion about what the legislature intended in ORS 215.296(1) by "significant" changes. See SDC III , 284 Or. App. at 486, 391 P.3d 932 (A "significant" change "will significantly decrease the supply of agricultural land, the profitability of the *706 farm, or the provision of food."). In their view, LUBA's construction of ORS 215.296(1), with its focus on the ordinary meaning of "significant" changes to farm practices or their costs on a farm-by-farm basis, was correct.
Riverbend and the county primarily respond that, although petitioners are urging that the case presents a legal question about the meaning of the term "significant," this case turns on the sufficiency of facts in the record instead. That is because they view the significance of changes to farm practices or of cost increases as a fact question for the county. Thus, Riverbend and the county argue, when a local government determines that an applicant has satisfied the farm impacts test, LUBA must defer to the local government's decision whenever the record would permit that finding. They also argue that the Court of Appeals was correct about what constitutes a significant change or cost increase and that the county properly applied that standard.
**446 As a preliminary matter, we disagree that the issue on review is, at its core, a fact question. Although the question whether a proposed nonfarm use meets the farm impacts test ultimately depends in part on the facts, that question also depends on whether the local government applies the correct test supplied by ORS 215.296(1). And how a "significant" change or cost increase in farm or forest practices is determined is a question of law. That question-and the nature of such a legal standard-requires us to construe ORS 215.296(1).
We begin that task by examining the text and context of ORS 215.296(1), with the goal of determining legislative intent. State v. Gaines , 346 Or. 160, 171, 206 P.3d 1042 (2009). That statute, enacted in 1989, Oregon Laws 1989, chapter 861, section 6, provides:
"A use allowed under ORS 215.213(2) or (11) [uses permitted in EFU zones in marginal lands counties] or 215.283(2) or (4) [uses permitted in EFU zones in nonmarginal lands counties] may be approved only where the local governing body or its designee finds that the use will not:
"(a) Force a significant change in accepted farm or forest practices on surrounding lands devoted to farm or forest use; or
"(b) Significantly increase the cost of accepted farm or forest practices on surrounding lands devoted to farm or forest use."
ORS 215.296(1).
Some of the terms used in ORS 215.296(1) are statutorily defined. An "accepted farming practice" is defined in ORS 215.203(2)(c) as a "mode of operation" that is "necessary for the operation of such farms to obtain a profit in money" and that is "utilized in conjunction with farm use." "Farm use" is also defined, and it is undisputed that surrounding lands are devoted to farm use.[2]
**447 But ORS 215.296(1) also contains key undefined phrases: specifically, when the nonfarm use will "[f]orce a significant change" in accepted farm or forest practices "on surrounding lands" or when it will "[s]ignificantly increase the cost" of those accepted farm or forest practices. In large part, the dispute boils down to what the legislature intended by using those phrases and whether "significant" and "significantly" were intended to have their ordinary meaning or another, specialized meaning.
*707 We start with the ordinary meaning of "significant" and "significantly." As petitioners note, the court regularly presumes that the legislature intended to give undefined words in a statute their ordinary meanings. See, e.g. , Hodges v. Oak Tree Realtors, Inc. , 363 Or. 601, 608, 426 P.3d 82 (2018). Dictionary definitions help to articulate the ordinary meanings of the adjective "significant" and the adverb "significantly." We agree with LUBA-and amicus the state-that the following definition of "significant" from Webster's Third New International Dictionary is most apt: "3 a : having or likely to have influence or effect : deserving to be considered : IMPORTANT, WEIGHTY, NOTABLE[.]" Webster's at 2116 (unabridged ed. 2002).
As used in ORS 215.296(1) to modify a "change in accepted farm or forest practices on surrounding lands," the ordinary meaning of "significant" indicates that the change has, or is likely to have, an important influence or effect on the farm or forest practices "on surrounding lands." Similarly, the ordinary meaning of "significantly" with respect to an increase in the cost of accepted farm or forest practices appears to mean to increase the cost in a significant manner, that is, in an influential and important way. See Webster's at 2116 (defining "significantly" as "in a significant manner *** : to a significant degree").
**448 Petitioners further argue that the phrase "farm or forest practices on surrounding lands" refers to each individual farm or forest practice on all surrounding lands; therefore, the significance of changes is considered as to each farm or forest practice. LUBA accepted that reading of ORS 215.296(1). See SDC I , 72 Or. LUBA at 359 n. 12 (whether a change or cost increase in farm practices is significant is determined on an individual basis and not by reference to a group of farm practices on surrounding lands). Petitioners also note that nowhere in ORS 215.296(1) does the text refer to the supply of agricultural land or the provision of food, factors that the Court of Appeals used to determine the significance of changes to farm practices and to the cost of those practices.
In urging us to conclude that the legislature instead intended a "significant" change or cost increase to have a specific impact, namely, one that results in a reduction in agricultural land in the surrounding area, Riverbend and the county primarily rely on context, but they partly ground their argument in the text of ORS 215.296(1). Their textual argument focuses on the prepositional phrase "change *** on surrounding lands." As Riverbend and the county understand it, that phrase requires a local government to view the significance of a change to a farm or forest practice by looking to its effect on surrounding lands. According to Riverbend and the county, a change is not "significant" under ORS 215.296(1) if the nonfarm use does not affect the supply of agricultural land in the surrounding area, even if the nonfarm use may force a change to an accepted farm practice that matters to a farmer. Although petitioners' reading of the statute is more consistent with our typical approach of relying on the ordinary meaning of undefined terms in a statute, Riverbend and the county's reading of the text is at least a possible one.
We next examine the context of ORS 215.296(1) to help us construe those disputed phrases. As noted earlier, the legislature has adopted a statutory agricultural land use policy set out in ORS 215.243. Context includes related statutory policy provisions. See TriMet v. Amalgamated Transit Union Local 757 , 362 Or. 484, 497, 412 P.3d 162 (2018)
**449 (reviewing as context overarching policy of public meetings law). Because state and local land use laws must be consistent with the statewide land use goals, Goal 3 is also relevant context. See, e.g. , Wetherell , 342 Or. at 681, 160 P.3d 614 (referring to Goal 3 in analyzing whether an agricultural land use statute permitted or required a local government to consider profitability to determine when agricultural land is suitable for farm use).
The Court of Appeals considered two statutory provisions in its contextual analysis. First, it appears that the Court of Appeals relied on the legislature's concern for preservation of "a maximum amount of the limited supply of agricultural land" as stated in *708 ORS 215.243(2) to conclude that the legislature intended "significant" changes in farm practices or their costs to be those that result in a reduction in the amount of agricultural land in the area. See SDC III , 284 Or. App. at 484-85, 391 P.3d 932 (citing subsection (2) of the statutory policy and concluding that whether a change is significant "is determined by whether the change affects the preservation of agricultural land for productive use") (footnote omitted). Whether or not the Court of Appeals intended it, its decision suggests that a "significant" change means one that will result in an impending reduction in the supply of agricultural land, and the parties understand the decision that way. The Court of Appeals also relied on the definition of "accepted farming practice" in ORS 215.203(2)(c) -especially the phrase "obtain a profit in money"-to conclude that the legislature intended the farm impacts test to preserve agricultural land for "the purpose of obtaining a profit in money." SDC III , 284 Or. App. at 485, 391 P.3d 932. We discuss the contextual significance of each of those statutes in turn and conclude that the Court of Appeals erred in the conclusions that it drew from them.
Although ORS 215.243(2) provides helpful context, other provisions of the statutory policy statement support a different understanding of the farm impacts test that does not depend on impending changes in the supply of agricultural land or a focus on the profits of the farm in question. Subsection (1) of ORS 216.243 provides that "[o]pen land used for agricultural use is an efficient means of conserving **450 natural resources that constitute an important physical, social, aesthetic and economic asset" for all Oregonians. And subsection (2), in addition to referring to preservation of a "maximum amount" of agricultural land, refers to the necessity of preserving "such land in large blocks" to maintain "the agricultural economy of the state" and to assure "adequate, healthful and nutritious food for the people of this state and nation." Subsection (3) of the statute describes the detriment of encroaching urban development into rural areas, and subsection (4) describes the desired effect of EFU zoning-it "substantially limits alternatives to the use of rural land"-and justifies incentives for owners to retain rural lands in EFU zones. Together, those provisions suggest that the legislature's agricultural land use policy is a long-term one centered on preserving agricultural lands in large blocks for working farm and forest operations through limitations on nonfarm uses and development and through incentives for retention of rural lands in EFU zones; nothing suggests that profitability of specific farms is a focus of the policy. Subsection (2) is consistent with that understanding of the legislature's overarching agricultural land use policy.
Goal 3 reinforces that view of the legislative policy. When the legislature added the farm impacts test in 1989, the 1988 version of Goal 3 was in effect. The goal has remained unchanged since 1975: "To preserve and maintain agricultural lands." Just as currently provided, Goal 3 in 1988 concerned maintenance and preservation of agricultural lands "for farm use, consistent with existing and future needs for agricultural products, forest and open space." Goal 3 (1988) also provided that agricultural lands "shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS chapter 215." Under the headings "GUIDELINES" and "IMPLEMENTATION," Goal 3 instructed in 1988 (and still does):
"Non-farm uses permitted within farm use zones under ORS 215.213(2) and (3) and 215.283(2) and (3) should be minimized to allow for maximum agricultural productivity."
The emphasis in Goal 3 (1988) was not on a gross supply of agricultural land per se, but rather on preservation of large areas of productive, working agricultural land.
**451 And perhaps the most noteworthy contextual consideration for our construction of ORS 215.296(1) in this case is "the statutory framework within which the law was enacted." State v. Ofodrinwa , 353 Or. 507, 512, 300 P.3d 154 (2013) (internal quotation marks and citation omitted). As petitioners and amicus the state point out, the "significant change" wording in question in ORS 215.296(1) is substantially the same standard that the legislature had adopted six years earlier and codified in ORS 215.213(3)(a) as *709 part of the test for allowable nonfarm dwellings on EFU land. Or. Laws 1983, ch., 826 § 6. That statute provided (and in material part still provides):
"A single-family residential dwelling not provided in conjunction with farm use may be established on a lot or parcel [with certain described soils, or marginal lands]. A proposed dwelling is subject to approval of the governing body *** in any area zoned for exclusive farm use upon written findings showing all of the following:
"(a) The dwelling or activities associated with the dwelling will not force a significant change in or significantly increase the cost of accepted farming practices on nearby lands devoted to farm use ."
(Emphasis added.) Thus, when the 1989 Legislative Assembly enacted the ORS 215.296(1) farm impacts test, the same "significant change" standard already existed in ORS 215.213(3)(a). See ORS 215.213 (1987).
The legislative history of the 1983 amendment of ORS 215.213(3) sheds light on what the "significant change" standard means. First, the 1983 Legislative Assembly unmistakably chose "significant" rather than "major" as a lower threshold of interference with farm practices in the area that a local government must apply when considering whether to approve a nonfarm dwelling on EFU-zoned land. In 1981, the Joint Legislative Committee on Land Use established an EFU Task Force to recommend changes to improve the quality of EFU zone decision-making, and in November 1982, the Task Force submitted its report and recommendations to the joint committee. Sullivan & Eber, The Long and Winding Road at 27. The EFU Task Force proposed an amendment of ORS 215.213(3) that was incorporated into **452 Senate Bill (SB) 237 (1983) and adopted by the Senate. That Senate-approved version of the amendment had used the terms "major change" and "measurably increase":
"(a) The dwelling or activities associated with the dwelling will not force a major change in or measurably increase the cost of accepted farming practices on nearby lands devoted to farm use."
But when S.B. 237 went before the House Committee on Environment and Energy, the House Committee discussed that terminology and decided that it should be changed. Minutes, House Committee on Environment and Energy, S.B. 237, July 7, 1983, 7-9. Committee members discussed the terms "major" and "measurably" as "interference criteria" with farming and ranching. Tape Recording, House Committee on Environment and Energy, S.B. 237, July 7, 1983, Tape 282, Side B. Richard Benner, the 1000 Friends of Oregon representative, explained that the interference criteria in the bill focused on what farmers were concerned about: changes in practices and increases in costs. The bill reduced the factors to only those two, he explained, to simplify and to increase the usability of the test. He added that the intent of the two descriptors was twofold: the cost increase must be measurable and the change must be major. Id. Concerns were raised about whether farmers would be adequately protected by a test based on whether the proposed nonfarm dwelling on marginal lands "will not force a major change in or measurably increase the cost of accepted farming practices on nearby lands devoted to farm use." Id .
Representatives Verner Anderson and Liz VanLeeuwen both advocated for changing the term "major" to "significant," which Representative Anderson noted "is less onerous than major ." Tape Recording, House Committee on Environment and Energy, S.B. 237, July 7, 1983, Tape 283, Side A (emphasis added). Ultimately, after discussing problems with the term "measurably increase," the committee voted to delete "major" and "measurably increase" and instead to adopt "significant" as the interference standard for changes in farming practices and in the costs of those practices. Minutes, House Committee on Environment and Energy, S.B. 237, July 7, 1983, 9. That part of the legislative **453 history of S.B. 237 suggests that the legislature selected an interference standard for nonfarm dwellings that was sensitive to the effect of the proposed dwelling on particular farming practices on surrounding farms.
The legislative history of S.B. 237 also suggests that the interference standard in ORS 215.213(3) for a proposed nonfarm dwelling on EFU-zoned land was directed at *710 particular farms and farming practices, not impending effects on the overall supply of agricultural land. At numerous points in the July 7 hearing before the House Committee on Environment and Energy, legislators focused on how the standard would be applied by a local government to specific examples of interference with specific farm practices on a nearby farm.
For example, Representative VanLeeuwen asked whether the following hypothetical situation would result in an increased cost under the standard that the Senate had adopted: "I have to set up my irrigation lines in a different pattern because of that [nonfarm dwelling] coming in." Tape Recording, House Committee on Environment and Energy, S.B. 237, July 7, 1983, Tape 283, Side A. Representative Tom Throop responded, "If it's quantifiable under the 'measurably increase' test. If it's judged under the 'major change,' then the county is going to have to look at what the farmer can tell them that means in terms of loss and decide whether or not it's major." Id.
Shortly thereafter, Representative Fred Parkinson asked an Agriculture for Oregon representative, Hector MacPherson, whether in MacPherson's opinion, there would be a time when "a significant change would not translate into dollars." Id. MacPherson responded, "I think any significant change probably would translate into dollars," but he tempered his conclusion by noting that people can disagree about "how significant" a change is: "Is it a little bit of thing? Is it the farmer's dogs coming over to hassle my sheep, in which [case] I've got to do something? Is that the significant one, or isn't it?" Id. Lois Kenagy, also of Agriculture for Oregon, then advocated for the "significant" standard of interference, using as an example a one-person farm operator dealing with nonfarm dwellings nearby:
**454 "And the major change can be the time on that farmer. And it's-it's a cost, but it's not a cost that I would guess the courts would recognize in terms of his hours. I mean, what kind of value do I put on my time, or my husband's time, when many times he's working for nothing as the year-end finances work out?
"But when I think of the time that's required to communicate with the neighbors, and to work out problems with all the surrounding rural residential things, that requires-it's a major change when we're working on a farm process surrounded by houses * * *. That is a major change. But it does not measurably increase in terms of the dollar outlay.
"And from our own situation, from my own experience and working in both suburban and the areas outside urban growth boundaries in both Corvallis and Albany, I think having both-having a significant change in the accepted farming practices or some kind of increase in the cost of accepted farming practices-I think both of those gives a better protection for agriculture ***."
Id. Thus, witnesses before the committee as well as the legislators had in mind a test that focused on the impacts that a nonfarm dwelling would have on particular nearby farmers and farm practices. The 1989 Legislative Assembly's choice of an almost-identical interference standard for the farm impacts test that applies to proposed nonfarm uses in EFU zones suggests that it intended the standards to be the same.
Thus, we disagree with the Court of Appeals that ORS 215.243(2) must lead to the conclusion that the legislature intended the farm impacts test to focus on impending changes to the gross supply of agricultural land. We agree that the legislature was concerned about the supply of agricultural land, but we conclude that the legislature intended the farm impacts test to focus on forced changes in farming and forest practices and the costs of those practices, as referenced in ORS 215.296(1). That reading of the farm impacts test is consistent with the statutory text, and the context that we have discussed indicates that the focus on adverse changes to operations on the affected farms was key. By adopting the farm impacts test, the legislature was not **455 content to disallow nonfarm uses only if there were impending reductions in the resulting supply of agricultural land. Instead, it appears that the legislature understood that adverse changes in farm practices or the costs of those practices could well *711 lead to later reductions in the supply of operating, productive agricultural land over time, as it becomes more onerous for owners to continue their agricultural use of EFU land due to nearby nonfarm uses.
As for the Court of Appeals' reliance on the part of the definition of "accepted farming practice" in ORS 215.203 (2)(c) relating to a profit, we do not share the court's conclusion that the legislature intended to focus the farm impacts test on preserving agricultural land to make a profit. If that were the legislature's purpose, the text that the legislature used to convey that purpose in ORS 215.296(1) would be, at best, obscure. The Court of Appeals' view is also inconsistent with the legislature's overarching concern with protecting Oregon's limited supply of productive agricultural land, a long-term legislative policy that this court has previously recognized.
In Craven v. Jackson County , 308 Or. 281, 287, 779 P.2d 1011 (1989), this court rejected a construction of ORS 215.203(2)(a) (defining "farm use" in part as "the current employment of land for the primary purpose of obtaining a profit in money by raising, harvesting and selling crops or the feeding, breeding, management and sale of, or the produce of," various animals and animal and agricultural products) that would have given "decisive weight to the idea of commercial enterprise and the statutory language 'for the primary purpose of obtaining a profit in money.' " The court concluded that giving decisive weight to profitability would lead to ostensible farm uses that would be premised on the sale of agricultural products for a profit, possibly even in the form of "a shopping mall or supermarket," but that would ultimately subvert "[t]he goal of preserving land in productive agriculture." Id. at 288, 779 P.2d 1011. See also Sullivan & Eber, The Long and Winding Road at 20 (explaining that the "underlying assumption" of the agricultural land use system is, "long term resource decisions should not be based on short-term economics").
**456 Furthermore, we reject the Court of Appeals' holding to the extent that it suggests that the test is met when there is no increased cost, or reduced profitability, to a particular farm, even when the farmer has been forced to change accepted farm practices. See, e.g. , SDC III , 284 Or. App. at 493, 391 P.3d 932 (stating that the issue "is not whether the effects of nuisance birds are significant, but rather whether those effects will force a change in farm practices that significantly inhibits the use of agricultural land for profit"). As noted earlier, ORS 215.296(1) plainly states that an applicant must establish that neither significant changes to accepted farm practices nor significantly increased costs will occur due to the nonfarm use.
Our review of the 1989 legislative history concerning the enactment of the farm impacts test does not change our reading of the text in context. The farm impacts test in ORS 215.296 was enacted in 1989, through House Bill (H.B.) 2682. Or. Laws 1989, ch., 861, § 6. The legislative history of ORS 215.296 does not reflect any recorded discussion of the terms "significant change" or "significantly increase the cost."
The farm impacts test standards were added in the A-9 amendments to H.B. 2682, after the bill had reached the Senate Committee on Agriculture and Natural Resources. Minutes, Senate Committee on Agriculture and Natural Resources, H.B. 2682, June 16, 1989, 3. A staff person explained that the A-9 amendments "include a lot of things, that Christmas tree type bill," and that it was the product of days of discussion by a work group. Tape Recording, Senate Committee on Agriculture and Natural Resources, H.B. 2682, June 16, 1989, Tape 186, Side A (statement of research associate Holly Duncan). The hearing minutes summarize the testimony of Neil Kagan of 1000 Friends of Oregon: "The A-9 amendments add standards for approval of conditional uses in general." Minutes, Senate Committee on Agriculture and Natural Resources, H.B. 2682, June 16, 1989, 3. At the committee hearing, Kagan also provided testimony that "the amendments in A-9 establish an enforcement mechanism to ensure that a conditional use permittee abides by the conditions that are imposed on the use" and **457 that, through the amendments, "all conditional uses may only be approved if there's a showing that they will not *712 force a significant change." Tape Recording, Senate Committee on Agriculture and Natural Resources, H.B. 2682, June 16, 1989, Tape 186, Side A. After other witnesses had testified in support, at the end of the half-hour hearing, the bill with the A-9 amendments was moved to the floor with a "do pass" recommendation. Minutes, Senate Committee on Agriculture and Natural Resources, H.B. 2682, June 16, 1989, 2, 5. Thus, the minutes and recordings relating to H.B. 2682 shed no additional light on the interference standards used in the farm impacts test in ORS 215.296(1).
Our conclusion that the legislature intended the farm impacts test to prevent adverse changes in accepted farm practices or their costs that are "significant," as that word is ordinarily understood, aligns with an earlier Court of Appeals decision construing ORS 215.296(1) that LUBA relied on in this case: Von Lubken v. Hood River County , 118 Or. App. 246, 846 P.2d 1178 (1993). In Von Lubken , the court concluded that the farm impacts test provides substantive protection for agricultural uses of land-not immediate impacts on the supply of land- and that "significant" had its ordinary meaning, which cabined the extent of the protection offered by the farm impacts test. Id. at 250-51, 846 P.2d 1178. Rather than addressing the amount of available land for agriculture, the court explained, "[t]he substance of the statute addresses the concern * * * that agricultural uses not be displaced by or subjected to interference from non-farm uses." Id. at 250, 846 P.2d 1178 (emphasis in original).
Having decided the interference standard that the legislature intended in ORS 215.296(1), we briefly address how that standard is applied to any single accepted farm practice, a matter on which the parties agree. Although applying its understanding of what it means for a change or cost increase to be "significant," the Court of Appeals applied the test of significance to each change or cost increase on each affected farm. See SDC III , 284 Or. App. at 485-86, 391 P.3d 932 (applying the significance test to the specific practices on the McPhillips and Frease farms, including consideration of the conditions of approval). LUBA did so as well, and that is **458 how the parties litigated the case. We agree that the legislature intended the "significant change" in a farm practice or "significantly increased cost" of a farm practice standard to apply practice by practice and farm by farm, as the text and context of the farm impacts test suggest.
To summarize, when the parties dispute whether a nonfarm use will force a significant change to a particular accepted farm practice or significantly increase the cost of that practice, the farm impacts test in ORS 215.296(1) requires an applicant to prove that the proposed nonfarm use (1) will not force a significant change in the accepted farm practice and (2) will not significantly increase the cost of that practice. A "significant" change or increase in cost is one that will have an important influence or effect on the farm. For each relevant accepted farm practice, if the applicant cannot prove both of those elements without conditions of approval, the local government must consider whether, with conditions of approval, the applicant will meet the farm impacts test.
2. Cumulative impacts
We now turn to how the farm impacts test applies to cumulative impacts. As noted earlier, both LUBA and the Court of Appeals have required local governments to apply the farm impacts test to each particular change or cost increase in accepted farm practices and then to changes or cost increases considered in the aggregate. On review, no party disputes that requirement. Rather, the parties dispute how the local government determines the significance of cumulative impacts caused by proposed nonfarm uses that, viewed discretely, are not significant.
LUBA concluded that Von Lubken did not specify the scope of the inquiry and that, because no party had argued that the required analysis involved review of "the cumulative impact of the same type of individual impact (e.g. nuisance birds) spread across multiple farms (e.g. McPhillips, Frease, and others)[,]" LUBA would limit its cumulative impacts analysis in this case "to the cumulative effect of different kinds of individual impacts on each separate farm, not the cumulative *713 effect of the same kind of impacts on **459 multiple farms considered together." SDC II , 74 Or. LUBA at 35 n. 24. LUBA concluded that the county on remand had misconstrued the applicable cumulative effects analysis. Id. at 35.
The Court of Appeals rejected petitioners' argument that the analysis required the county to consider the significance of impacts across all the farms on surrounding lands and affirmed the farm-by-farm cumulative effects analysis that LUBA required in this case. 284 Or. App. at 495-96, 391 P.3d 932. The court reasoned that a nonfarm use that "does not significantly displace or interfere with accepted farm practices at a particular farm in the surrounding lands does not displace or interfere with accepted farm practices in the surrounding lands at all. The whole is equal to the sum of its parts." Id. at 496, 391 P.3d 932. The court also agreed with LUBA that the county's findings and analysis were conclusory and deficient. Id.
On review, the parties maintain their positions. Petitioners and amicus Oregon Farm Bureau Federation argue that the cumulative impacts inquiry requires the local government to evaluate "cumulative impacts across all impacted landowners" or "across all surrounding lands." Riverbend and the county argue that the county conducted the proper evaluation of cumulative impacts by looking "at all impacts together where multiple impacts exist."
In view of how the case was litigated before LUBA, we affirm the remand to the county to decide whether cumulative impacts on each farm are significant. See ORS 197.763(1) ("An issue which may be the basis for an appeal to the Land Use Board of Appeals shall be raised not later than the close of the record at or following the final evidentiary hearing on the proposal before the local government. Such issues shall be raised and accompanied by statements or evidence sufficient to afford the governing body, planning commission, hearings body or hearings officer, and the parties an adequate opportunity to respond to each issue."); ORS 197.835(3) (issues before LUBA "shall be limited to those raised by any participant before the local hearings body"). Our decision does not foreclose another party in another case from arguing that the cumulative impacts test requires also considering more than the aggregate **460 of multiple less-than-significant impacts on each farm. However, we raise the question whether petitioners' position on the cumulative impacts analysis runs counter to the farm-focused test for individual changes to accepted farm practices or increases in costs of those practices.
B. Conditions of Approval Permitted by ORS 215.296(2)
The last area of dispute concerns the county's conditions of approval. Both LUBA and the Court of Appeals approved the county's conditions of approval concerning accepted farm practices on the McPhillips and the Frease farms. Petitioners on review continue to challenge the propriety of conditions related to those two farms under ORS 215.296(2).
Subsection (2) of ORS 215.296 provides that an applicant may rely on conditions of approval to meet the farm impacts test:
"An applicant for a use *** may demonstrate that the standards for approval set forth in subsection (1) of this section will be satisfied through the imposition of conditions. Any conditions so imposed shall be clear and objective."
Other than the command that "[a]ny conditions so imposed shall be clear and objective[,]" the text of ORS 215.296(2) does not meaningfully inform the nature of the conditions that may be imposed to satisfy the standards in ORS 215.296(1).
On review, petitioners do not argue that the county's conditions failed the "clear and objective" standard. But they maintain their objections to the condition of approval for litter patrols on the McPhillips farm and the condition requiring Riverbend to pay for the entire crop of berries and cherries on the Frease farm on the ground that those conditions improperly impose on those farmers significant changes to accepted farm practices. McPhillips, petitioners argue, will now have people walking his fields to pick up trash before haying. Consistently with LUBA's conclusion but contrarily to the Court of Appeals' determination, petitioners *714 insist that, regardless of who pays for the litter patrol, that condition is a significant change in accepted farm practices. And for Frease, she had to stop a small "U-pick" cherry and **461 berry harvest on her hazelnut farm due to nuisance birds. Petitioners argue that marketing fruit to the public is an accepted farm practice, as LUBA and the Court of Appeals concluded, but having Riverbend pay Frease for unmarketable fruit is not and affects the preservation of productive agricultural land. They contend that the Court of Appeals incorrectly concluded that McPhillips experienced only an inconsequential cost increase, because litter patrols are not accepted farm practices and do not change such practices. See SDC III , 284 Or. App. at 483, 391 P.3d 932. They also argue that, taken to its logical conclusion, the Court of Appeals' approval of payments to a farmer who is unable to farm some crops would lead to the ability of a nonfarm use to pay for a farm.
Amicus the state agrees that the condition under ORS 215.296(2) requiring Riverbend to pay a subsidy for Frease's lost fruit crop does not adequately address that important effect on her land, namely, the reduction of her orchard's agricultural production. In the state's view, "conditions imposed under ORS 215.296(2) should be measured by how the conditions prevent the loss of agricultural land. Sometimes that measure may be met by a cash payment, but more often it will be met only by concrete alterations to the nonfarm use that render it compatible with the farm or forest practices on the surrounding lands."
We agree with petitioners' and the state's arguments concerning the Frease condition of approval. For two reasons, the Court of Appeals has adopted a test for conditions under ORS 215.296(2) that erroneously focuses on the profitability of the existing farm practices on the surrounding lands.
First, the context of ORS 215.296(2), which includes the increased cost interference standard used in ORS 215.213(3)(a), suggests that the legislature did not intend to have local governments force farmers to engage in a negotiation with a nonfarm use to obtain payment for the impacts to their operation. In 1983, House committee members considering the standards for approval of nonfarm dwellings on EFU lands discussed the possibility of applicants for nonfarm dwellings compensating farmers for increases in the cost of farming, whether by agreement or through litigation.
**462 Tape Recording, House Committee on Environment and Energy, S.B. 237, July 7, 1983, Tapes 282 Side B and 283 Side A. Representative VanLeeuwen stated:
"An unmeasurable cost that really gets into this situation is the activity associated with the dwelling if that person has a big dog, or even a little dog, and then they run out through your field a number of times, you can't really measure that cost, but you know there was a cost in shattered seed."
Id. , Tape 283, Side A. Representative Throop explained that the standard should avoid having farmers dealing with compensation from neighbors:
"We shouldn't be setting up a situation where we're going to be requiring that farmers get into compensation with their neighbors and the like. The idea behind the criteria that is included in this draft is to prevent those situations from occurring in the first place. And I thought that was our objective in trying to redefine the criteria for the EFU zone. If it was going to have an impact on that farming practice, then that nonfarm dwelling wouldn't be allowed."
Id. Second, a test for conditions that permits a payment to the farmer and approval of the nonfarm use, even when the nonfarm use will result in the inability of the farmer to engage in an accepted farming practice, contravenes the legislature's long-term policy of preserving agricultural land.
We also agree with petitioners that LUBA correctly concluded that the litter patrol and the landfill waste cleanup on the McPhillips hay farm forced a change in accepted farm practices for growing, harvesting, and baling hay. However, whether that change was substantial is not ameliorated by the condition that Riverbend pay for increased costs of cleanup. Regardless of whether McPhillips or Riverbend pays, the accepted farm practices *715 on the McPhillips farm will be changed. Accordingly, LUBA must reconsider whether the county correctly determined that the change in accepted farm practices was not substantial before it remands to the county.
The decision of the Court of Appeals is affirmed in part and reversed in part. The final opinion and order of the **463 Land Use Board of Appeals is affirmed in part and reversed in part, and the matter is remanded to the board for further proceedings.

DLCD also has promulgated administrative rules to implement statutes concerning agricultural land and "to preserve and maintain agricultural lands as defined by Goal 3 for farm use[.]" OAR 660-033-0010 ; see generally OAR ch, 660, div. 33 (regarding agricultural land).

Pursuant to ORS 215.203(2)(a), "farm use" means
"the current employment of land for the primary purpose of obtaining a profit in money by raising, harvesting and selling crops or the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. 'Farm use' includes the preparation, storage and disposal by marketing or otherwise of the products or by-products raised on such land for human or animal use. 'Farm use' also includes the current employment of land for the primary purpose of obtaining a profit in money by stabling or training equines ***. 'Farm use' also includes the propagation, cultivation, maintenance and harvesting of aquatic, bird and animal species that are under the jurisdiction of the State Fish and Wildlife Commission ***. 'Farm use' includes the on-site construction and maintenance of equipment and facilities used for the activities described in this subsection."